IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

LINDA K. BRANSCUM                                                               PLAINTIFF

v.                      NO. 3:17-cv-00277 PSH

NANCY A. BERRYHILL, Acting Commissioner            DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda K. Branscum ("Branscum") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Branscum maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Branscum so maintains for several reasons, the primary one being that her residual functional capacity was not properly assessed.

Branscum was born on March 14, 1964, and was fifty years old on March 14, 2014, the day she allegedly became disabled. She filed her application for disability insurance benefits on January 12, 2015, and alleged that she became disabled as a result of, <u>inter alia</u>, back problems, hypertension, anxiety, and asthma.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See <u>Boettcher v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

The bulk of the medical evidence consists of the progress notes of Branscum's treating physician, Dr. Charles Davidson, M.D., ("Davidson"), or his assistant. The progress notes reflect that Branscum saw Davidson or his assistant on numerous occasions between September 6, 2012, and April 6, 2015, for several complaints, the primary of which were low back pain and anxiety.[2] Branscum's pain was exacerbated with twisting movements and caused weakness in her legs. She was prescribed medication that included Mobic, and she reported some relief from the medication. With respect to Branscum's anxiety, the author of the progress notes observed that Branscum's symptoms included apprehension, shortness of breath, tachycardia, and shaking. The symptoms were oftentimes accompanied by panic attacks. Her symptoms were exacerbated by crowds, public places, and family stress. Medication was prescribed, medication that included benzodiazepine and Paxil.

Davidson ordered testing during the period he saw Branscum. For instance, on November 7, 2013, Branscum underwent an MRI of her lumbar spine. See Transcript at 270-271. No acute fracture or malalignment was noted. The attending physician interpreted the result as follows: "[m]ild attenuation of both lateral recesses at L3-L4 and L4-L5. No significant neural impingement is appreciated. Partial sacralization of L5 on the left." See Transcript at 271.

---

[2] See Transcript at 319-320 (09/06/2012), 316-317 (10/04/2012), 313-315 (10/11/2012), 311-312 (11/05/2012), 309-310 (12/05/2012), 307-308 (01/04/2013), 305-306 (02/04/2013), 303-304 (03/04/2013), 301-302 (04/03/2013), 299-300 (05/03/2013), 297-298 (06/03/2013), 294-296 (06/21/2013), 292-293 (07/01/2013), 290-291 (07/15/2013), 288-289 (08/01/2013), 286-287 (09/12/2013), 284-285 (10/04/2013), 282-283 (11/04/2013), 279-280 (12/04/2013), 276-278 (01/03/2014), 274-275 (02/06/2014), 414-416 (03/06/2014), 411-413 (04/03/2014), 408-410 (04/28/2014), 405-407 (05/01/2014), 403-404 (05/15/2014), 400-402 (06/03/2014), 397-399 (07/03/2014), 394-396 (08/04/2014), 393 (08/29/2014), 390-392 (09/02/2014), 387-389 (10/02/2014), 384-386 (10/20/2014), 381-383 (11/03/2014), 379-380 (11/24/2014), 376-378 (12/03/2014), 373-375 (12/23/2014), 370-372 (01/05/2015), 368-369 (01/06/2015), 365-367 (02/05/2015), 363-364 (02/25/2015), 360-362 (03/09/2015), 357-359 (04/06/2015).

Davidson referred Branscum to Dr. Tim Maryanov, M.D., ("Maryanov") for an evaluation of Branscum's back pain. See Transcript at 321-322. Maryanov examined Branscum on November 28, 2013, and his observations included the following: her orientation was good; her attention was appropriate; her gait was normal; a "musculoskeletal exam [was] significant for exquisite tenderness to palpation of the right sacroiliac joint;" a "motor exam of the lower extremities show[ed] full 5/5 motor strength in bilateral iliopsoas, quads, hamstrings, dorsiflexion, and plantar flexion;" and she had a "positive FABER flexion abduction external rotation of the thigh maneuver on the right side." See Transcript at 321. Maryanov reviewed Branscum's earlier lumbar spine MRI and observed that the results were "near normal." See Transcript at 321. Maryanov found evidence that suggested "sacroiliac joint pathology." See Transcript at 322. He recommended against surgical intervention but instead recommended physical therapy and also referred her to Dr. Gregory Ricca, M.D., ("Ricca").

Branscum saw Ricca on October 21, 2014. See Transcript at 347-352. Branscum reported muscle aches in her lower back and lower extremities, joint pain in her hip and right knee, and some swelling in her hands. Ricca observed that she had a normal range of motion in the thoracic and lumbar portions of her spine, but her gait was moderately antalgic with a right limp. He diagnosed, inter alia, lumbago with sciatica and right sacroiliitis. She chose to undergo a diagnostic right sacroiliac joint block.

Branscum saw Ricca again on January 27, 2015. See Transcript at 342-346. She had undergone two right sacroiliac joint blocks by that time, but she reported little

benefit. She continued to complain of pain in her right groin and right thigh. He observed that she was using a cane to walk, specifically noting the following:

> Ms. Branscum uses a cane because "my doctor told me not to go anywhere without it." He made this suggestion "because I've been falling a lot." She has only fallen once since she stated using it 2-3 months ago.
>
> …
>
> She has been using a cane for the past month because "my [right] leg would just go [out], and I can't catch myself."

See Transcript at 342. A physical examination revealed, in part, that Branscum had no muscle aches or joint pain but did have localized soft tissue swelling of the ankle. Ricca observed that Branscum had a normal range of motion in her thoracic and lumbar spines, but she continued to walk with a right limp. He was unable to identify a "structural cause" for her pain. See Transcript at 346.

On February 11, 2015, Branscum sought medical attention at Five Rivers Medical Center after missing a step and falling down some stairs. See Transcript at 475-487. X-rays of her right ankle were taken, and the results revealed a "[f]racture-dislocation of the distal tibia and fibula" and "[d]isruption of the tibiotalar joint." See Transcript at 485. The following day, Dr. Rolando Cheng, M.D., ("Cheng") performed an open reduction and internal fixation of Branscum's right ankle. See Transcript at 488-489. Branscum was seen for follow-up on what appears to have been five occasions. See Transcript at 490-491 (02/24/2015), 493 (03/18/2015), 494 (03/20/2015), 496 (03/31/2015), 497-499 (06/11/2015). X-rays of her right ankle were taken on June 11, 2015, and the results revealed a successful reduction of the fracture sites and "[f]racture fragments now present in near anatomic alignment." See Transcript at 497.

4

No signs of new bony abnormalities were observed. Although Branscum was experiencing some swelling, Cheng observed that she was doing better.

On May 27, 2016, an MRI was taken of Branscum's lumbar spine at the direction of Davidson. See Transcript at 506-507. The attending physician interpreted the results as follows:

> Multilevel degenerative disc changes and facet arthropathy in the lumbar spine … Findings are not significantly changed compared to the 11/7/2013 exam. Mild spinal canal narrowing at L2-3, L3-4, and L4-5 levels.
>
> Left lateral recess narrowing and moderate left neural foraminal narrowing at L3-4 appears unchanged compared to the previous exams.
>
> Transitional lumbosacral anatomy with partial sacralization of the L5 vertebral body on the left.

See Transcript at 507.

On June 13, 2016, Davidson completed a Medical Source Statement ("Statement") regarding Branscum's physical limitations. See Transcript at 508. In the Statement, he represented that she can lift and carry ten pounds occasionally but can lift and carry less than ten pounds frequently, she can stand and walk for less than two hours in an eight hour workday, she can sit for less than two hours in an eight hour workday, and she is unable to reach. He also stated that she must change positions frequently, requires frequent rest periods, and requires longer than normal breaks. According to Davidson, Branscum must avoid all exposure to perfumes and must avoid even moderate exposure to things like extreme heat, high humidity, and chemicals. Davidson opined that Branscum's impairments or treatment would require her to miss work more than three days a month. He represented that his opinions were based on

5

the pain she exhibited with movement and certain activities; her inability to maintain any position for more than a few minutes; and the results of her May 27, 2016, MRI, which he characterized as abnormal.

Branscum's medical records were reviewed by state agency medical professionals. See Transcript at 57-67, 69-81. The medical professionals opined that she could perform a range of light work with no mental limitations.

A series of documents were completed by Branscum and her daughter in connection with Branscum's application. See Transcript at 168-174, 175-176, 177-184, 185-191, 194-200, 201-210, 21-212, 213-220, 223-230. In the documents, it was represented that Branscum experiences pain in her back, hip, leg, and ankle when she attempts to work. It was further represented that she has difficulty attending to her own personal care, can only occasionally prepare a meal, can perform minimal housework but no yard work, has difficulty getting around, and uses assistive devices to walk. The documents indicate she can shop for groceries and manage her finances. Her hobbies include watching television, reading her Bible, and playing with her grandchildren. She spends time with others and enjoys attending church. Branscum claims her mental impairment causes difficulties with memory, concentration, and completing tasks. She states she can follow short written and spoken instructions but has difficulty with longer written and spoken instructions.

The record contains evidence of Branscum's work record. See Transcript at 154-155, 156-159, 160. Her work record reflects that she had minimal reportable earnings between 1981 and 2008. She had some reportable earnings from 2009 through 2013, but minimal or no reportable earning after 2013.

Branscum testified during the administrative hearing. See Transcript at 37-51. She stated she was fifty-two years old and a high school graduate. She worked as a substitute teacher and later as a teacher's aide in public high schools in the State of Arkansas. When asked about her last job, she testified as follows:

> I left my last job because I couldn't walk around and get around like I used to. I was having problems. My back was worse to me. The pain was awful. I had to take medication daily, and I didn't feel like I needed to be taking medication and driving and working …
>
> Did you quit the job or were you terminated?
>
> I quit it.

See Transcript at 40-41. Branscum uses a cane to walk but acknowledged that no physician prescribed the use of a cane. Branscum's use of a cane depends upon how she feels from one day to the next. She takes medication for her symptoms, and the medication is of some benefit. On a good day, she can help with chores around her house. She can shop but does not like going out because of her anxiety. Branscum has pain in her back and pelvis that is exacerbated with movement. Her pain is relieved by lying down, which she states she must do for approximately three hours a day. She takes oxycodone and muscle relaxers for her pain. She has difficulty breathing and uses an inhaler. Branscum experiences migraine headaches, having one at least three times a month. When she has one, she retires to her bed for approximately an hour. She also claims she suffers from depression, anxiety, and panic attacks. She takes medication for her symptoms, medication that includes Xanax and Paxil.

The ALJ found at step two of the sequential evaluation process that Branscum has severe impairments in the form of "remote right ankle fracture, status post open

reduction internal fixation, degenerative disc disease of the lumbar spine, morbid obesity, hypertension, anxiety, and depression." See Transcript at 19. He assessed her residual functional capacity and found that she can perform light work albeit with the following limitations:

> … [Branscum] cannot climb ladders, ropes, or scaffolds. She can no more than occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights in the workplace. She is limited to unskilled, simple, routine, and repetitive task jobs, where the supervision will be simple, direct, and concrete. She is limited to SVP one or two jobs that can be learned within 30 days. She is to have no contact with the general public.

See Transcript at 21. In so finding, the ALJ accepted that Branscum's impairments result in some limitation of her work-related functioning. Specifically, he noted the following:

> While it is clear that [Branscum's] severe impairments result in limitations in some work-related functioning, [the ALJ] has accounted for said limitations by restricting [Branscum] to work at the light exertional level with additional postural and mental limitations. This modified light residual functional capacity addresses [her] antalgic gait, tenderness, decreased sensation, subjective complaints of pain, headaches, and chest pain. The medical imaging of record further support the weight and postural limitations. Additionally, the mental limitations account for [her] depressed/anxious mood, panic attacks, and medication side effects.

See Transcript at 25. In assessing Branscum's residual functional capacity, the ALJ gave little weight to Davidson's opinions contained in the Statement because they are inconsistent with his "objective findings and the other evidence of record." See Transcript at 24. The ALJ found at step four that Branscum cannot perform her past relevant work. A vocational expert testified that someone with Branscum's limitations can, though, perform other jobs. The ALJ credited the testimony and found at step five that there are other jobs Branscum can perform.

Branscum maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. She maintains that her residual functional capacity was not properly assessed, in large part, because the ALJ discounted Davidson's opinions contained in his June 13, 2016, Statement.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). It is made using all of the relevant evidence in the record and must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of the assessment, the ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's opinions are given controlling weight "if, and only if, [they are] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." See Winn v. Commissioner, 2018 WL 3322247, 3 (8th Cir. July 6, 2018) [internal quotations omitted].

The reasons the ALJ gave for discounting Davidson's opinions in his June 13, 2016, Statement are supported by substantial evidence on the record as a whole. The Court so finds for two reasons.

First, the ALJ could and did find that Davidson's opinions are inconsistent with the progress notes compiled by Davidson and his assistant. The author of the progress notes repeatedly recorded Branscum's complaints of pain, observed that she had a limited range of motion in her back, walked with a limp, and occasionally used an assistive device to walk. Branscum was instructed to avoid heavy lifting and, at times, was instructed not to work. The latter recommendation is problematic because there

9

is nothing to suggest that the author knew the demands of Branscum's work. Moreover, the author did not explain the reasons for making the recommendation. In short, it is not clear how Davidson could have offered the opinions he did based on such minimal findings and observations.

Second, the ALJ could and did find that the opinions Davidson offered in his June 13, 2016, Statement were inconsistent with the results of the medical testing. A November 7, 2013, MRI of Branscum's lumbar spine revealed no acute fracture or malalignment and no significant neural impingement. Instead, the results revealed mild attenuation of both lateral recesses at L3-L4 and L4-L5 and a partial sacralization of L5 on the left. Maryanov characterized the results of the MRI as "near normal." See Transcript at 321.

A second MRI of Branscum's lumbar spine was performed on May 27, 2016. The results showed no significant change as the attending physician noted that the "[f]indings are not significantly changed compared to the 11/7/2013 exam." See Transcript at 507. The results of the May 27, 2016, MRI were interpreted as showing "[m]ultilevel degenerative disc changes and facet arthropathy in the lumbar spine;" "[m]ild spinal canal narrowing at L2-3, L3-4, and L4-5 levels;" and "[t]ransitional lumbosacral anatomy with partial sacralization of the L5 vertebral body on the left." See Transcript at 507.

On February 11, 2015, Branscum sought medical attention after missing a step and falling down some stairs. She was found to have a "[f]racture-dislocation of the distal tibia and fibula" and "[d]isruption of the tibiotalar joint." See Transcript at 485. An open reduction and internal fixation of her right ankle was performed. A subsequent

x-ray of the ankle revealed a successful reduction of the fracture sites and "[f]racture fragments now present in near anatomic alignment." See Transcript at 497. No signs of new bony abnormalities were observed. Although Branscum experienced some swelling, Cheng observed that Branscum's condition improved over time.

Davidson's opinions are also inconsistent with the findings and observations of the other medical professionals. When Branscum saw Maryanov on November 28, 2013, he observed that her gait was normal; a "musculoskeletal exam [was] significant for exquisite tenderness to palpation of the right sacroiliac joint;" a "motor exam of the lower extremities show[ed] full 5/5 motor strength in bilateral iliopsoas, quads, hamstrings, dorsiflexion, and plantar flexion;" and she had a "positive FABER flexion abduction external rotation of the thigh maneuver on the right side." See Transcript at 321. He recommended physical therapy and referred her to Ricca.

Branscum saw Ricca on October 21, 2014, and he observed that she had a normal range of motion in the thoracic and lumbar portions of her spine, but her gait was moderately antalgic with a right limp. He diagnosed, inter alia, lumbago with sciatica and right sacroiliitis and recommended a diagnostic right sacroiliac joint block.

When Branscum saw Ricca again on January 27, 2015, Branscum had undergone two right sacroiliac joint blocks that proved to be of little benefit. He observed that she was using a cane to walk, but she reported that her use of the cane had been a mere "suggestion" by a physician. See Transcript at 342. A physical examination revealed, in part, that she had no muscle aches or joint pain but did have localized soft tissue swelling of the ankle. Ricca observed that Branscum had a normal range of motion

in her thoracic and lumbar spines but continued to walk with a right limp. He was unable to identify a "structural cause" for her pain. See Transcript at 346.

"[W]hether the ALJ grants a treating physician's opinion[s] substantial or little weight, the regulations ... provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)]. In this instance, the ALJ gave good reasons for the manner in which he weighed Davidson's opinions contained in his June 13, 2016, Statement.

Branscum offers other reasons why her residual functional capacity was not properly assessed. She maintains that the ALJ misconstrued Cheng's treatment records, noting that the ALJ erred when he observed that "[b]y May 2015, treatment records show that [Branscum's] symptoms had been relieved with surgical repair and that her orthopedic surgeon was no longer prescribing [Branscum] pain medication." See Docket Entry 13 at CM/ECF 6 [quoting Transcript at 23].

The Court is satisfied that Cheng's treatment records could be construed as the ALJ did. Cheng performed the open reduction and internal fixation of Branscum's right ankle on February 12, 2015. Branscum subsequently reported that she was doing well. X-rays revealed a successful reduction of the fracture sites, and no signs of new bony abnormalities were observed. Although Branscum was experiencing some swelling, Cheng observed that Branscum was doing better. On April 6, 2015, Branscum reported to Davidson or his assistant that Cheng was no longer prescribing pain medication.

Branscum maintains that inadequate consideration was given to her use of an assistive device to walk. She represents that she has pain in her lower extremities and walks with a limp, and her use of an assistive device is therefore reasonable.

The Court is satisfied that the ALJ gave adequate consideration to Branscum's use of an assistive device to walk. The record reflects that her use of the device was never recommended by a physician but was only a suggestion by a physician, and Branscum appears to have only used such a device on an as-needed basis.

Branscum maintains that she cannot perform the standing and walking requirements of light work, work that requires a claimant to stand and walk for six hours in an eight hour workday. She maintains that she has trouble with her gait and experiences "weakness in her lower extremity, positive leg raises, chronic persistent back pain, muscle spasm, and decreased range of motion." See Docket Entry 13 at CM/ECF 7. Branscum maintains that the ALJ failed to acknowledge those limitations.

The Court is satisfied that the ALJ adequately accounted for Branscum's weakness in her lower extremity, positive leg raises, chronic persistent back pain, muscle spasm, and decreased range of motion. He crafted a residual functional capacity that limited her to light work with additional postural limitations, an assessment that addressed her "antalgic gait, tenderness, decreased sensation, subjective complaints of pain, headaches, and chest pain." See Transcript at 25.

Branscum maintains that too much weight was accorded her work record. She acknowledges that she only worked sporadically, particularly after Cheng performed an open reduction and internal fixation of Branscum's right ankle on February 11, 2015. Branscum maintains that her work record "raises questions as to whether [her]

continuing unemployment [was] actually due to a medical impairment." See Docket Entry 13 at CM/ECF 6.

The Court is satisfied that the ALJ did not accord too much weight to Branscum's work record, which is less than stellar. Although a claimant's limitations can cause a poor work record, there is little to suggest that Branscum's poor work record was caused by her impairments. Her work record was poor well before she allegedly became disabled on March 14, 2014.

Branscum maintains that she suffers from severe mental impairments in the form of "panic attacks, anxiety, anxiety attacks, depression, and fatigue." See Docket Entry 13 at CM/ECF 17. She maintains that the impairments were not adequately considered.

The Court is satisfied that the ALJ gave adequate consideration to Branscum's mental impairments and the limitations they cause. Although Branscum maintains that the impairments cause numerous work-related limitations, the evidence supporting the limitations is unremarkable. In any event, the ALJ crafted a residual functional capacity that limited her to light work with additional mental limitations in the form of the following: "[Branscum] is limited to unskilled, simple, routine, and repetitive task jobs, where the supervision will be simple, direct, and concrete. She is limited to SVP one or two jobs that can be learned within 30 days. She is to have no contact with the general public." See Transcript at 21.

The governing standard, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Branscum's residual functional capacity that limited her to light work with additional postural and

mental limitations. Branscum has not shown how the ALJ erred in doing so. In short, the ALJ could find as he did.

Berry offers a second reason why the ALJ's decision is not supported by substantial evidence on the record as a whole. Branscum maintains that the ALJ relied upon the answer to a flawed hypothetical question, flawed because it did not contain limitations for Branscum's difficulties standing and walking; her asthma, allergies, and dyspnea; and the side effects of her medication.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question must therefore include all of the claimant's impairments that are substantially supported by the record as a whole. See Id.

A vocational expert testified during the administrative hearing, see Transcript at 51-54, during which she was asked a series of hypothetical questions. In one question, the vocational expert was asked to assume an individual of Branscum's age, education, and work experience who could perform light work. The ALJ also identified a number of limitations that the individual had, none of which involved a severe restriction in the ability to stand and walk; asthma, allergies, and dyspnea; or the side effects of any medication. The vocational expert testified that the hypothetical individual could

perform work as a housekeeper and a price tag ticketer.[3] The ALJ credited the testimony and found that there are jobs Branscum can perform.

The ALJ did not err in crafting the hypothetical question or in relying upon the vocational expert's answer. The question captured the concrete consequences of Branscum's limitations and was adequately phrased. It is true that the question did not incorporate limitations for a severe restriction in the ability to stand and walk; asthma, allergies, and dyspnea; or the side effects of any medication. The ALJ's failure to do so, though, does not warrant a remand. Substantial evidence on the record as a whole supports the ALJ's determination that Branscum can stand and walk for up to six hours in an eight hour workday. There is also little evidence that Branscum's asthma, allergies, or dyspnea, or the side effects of her medication, significantly impact her work-related abilities.

On the basis of the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Branscum's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 30th day of July, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

---

[3] In a second question, the ALJ asked the vocational expert to assume the same limitations plus an inability to stand, walk, or sit for more than two hours in an eight hour workday. The vocational expert testified that there was no work available for such an individual. In a third question, the ALJ asked the vocational expert to assume the same difficulties plus, <u>inter alia</u>, depression and anxiety type issues. The vocational expert testified that there was no work available for such an individual.